IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
(Tallahassee Division)

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| Plaintiff, | :    Civil Action No. : 4:01cv238-SPM |
| v. | : |
| | : |
| COASTAL LUMBER COMPANY, | : |
| | : |
| Defendant. | : |

## CONSENT DECREE

Plaintiff, the United States of America, on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), filed a Complaint on June 14, 2001, alleging that Defendant Coastal Lumber Company (hereinafter "Coastal") violated the Clean Air Act ("CAA"), 42 U.S.C. § 7401 et seq., at its plywood manufacturing facility ("Facility") in Havana, Gadsden County, Florida.

The Complaint, pursuant to Section 113 of the CAA, 42 U.S.C. § 7413(b), sought injunctive relief and civil penalties for alleged violations of the Florida State Implementation Plan ("SIP") approved pursuant to Section 110 of the CAA, 42 U.S.C. § 7410, and the Prevention of Significant Deterioration ("PSD") provisions of the CAA, Part C of Title I, 42 U.S.C. §§ 7470--7492, and the regulations promulgated thereunder at 40 C.F.R. § 52.21 (the "PSD Rules"). The Complaint also sought an injunction ordering

Coastal to comply with the CAA and the laws and regulations promulgated thereunder, and civil penalties for Coastal's alleged violations of the CAA, at the Facility.

On November 26, 2001 the United States filed an Amended Complaint repeating the above stated allegations and alleging further that Coastal failed to comply with an order, issued by EPA pursuant to Section 114 of the CAA, 42 U.S.C. § 7414, to conduct emissions testing at the Facility. In addition to the relief requested in the original Complaint, the Amended Complaint also sought an injunction ordering Coastal to comply with the Section 114 test order, and civil penalties for Coastal's failure to comply with the Section 114 test order at its Facility.

The United States and Coastal have agreed on terms to settle this action. Settlement and entry of this Consent Decree does not constitute admission or acknowledgment of liability by Coastal, nor does it constitute adjudication by this Court of any issue of fact or law. The United States and Coastal have agreed that settlement of this action is in the public interest and that entry of this Consent Decree without further litigation is the most appropriate means of resolving this action.

IT IS, ADJUDGED, ORDERED, and DECREED THAT:

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 113(b) of the CAA, 42 U.S.C. § 7413(b).

2. Venue is proper in this District pursuant to Section 309(b) of the CAA, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), as it is the judicial

district in which the violations are alleged to have occurred and where Coastal can be found. Coastal does not contest the Court's jurisdiction over this action or over Coastal and does not contest venue in this judicial district.

3. For purposes of this Consent Decree, Coastal agrees that the Complaint states claims upon which relief may be granted pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), for alleged violations of the Florida SIP and the PSD provisions of the CAA, Part C of Title I, 42 U.S.C. §§ 7470 -- 7492, and the PSD rules.

## II. APPLICABILITY

4. The obligations of this Consent Decree apply to and are binding upon the United States and Coastal, its assigns, and successors.

5. At least thirty (30) Days prior to transferring ownership or operation of the Facility, or any portion thereof, to any other person, Coastal must provide a copy of this Consent Decree to each prospective successor owner or operator and must simultaneously verify its action by providing written notice to EPA Region 4, the United States Attorney for the Northern District of Florida, and the United States Department of Justice, in accordance with Section XVII ("Notices") of this Consent Decree. Any transfer agreement between Coastal and transferee must include transferee's acknowledgement of and written agreement to undertake the obligations required by this Consent Decree. No more than thirty (30) Days after transfer of ownership or operation of the Facility, the new owner or operator must provide written notification of the transfer in accordance with Section XVII ("Notices") of this Consent Decree.

6. Coastal must provide a copy of this Consent Decree to all officers, employees, and agents whose duties, in the sole judgment of Coastal, might reasonably include compliance with any provision of this Consent Decree, as well as to any contractor retained to perform work required under this Consent Decree. Coastal must condition any contract related to the implementation of or compliance with this Consent Decree upon performance of the work in conformity with the terms of this Consent Decree.

7. In any action to enforce this Consent Decree, Coastal may not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## III. DEFINITIONS

8. Unless otherwise expressly provided herein, terms used in this Consent Decree which are defined in the CAA or in the regulations promulgated pursuant to the CAA, will have the meaning assigned to them in the CAA and regulations. Whenever the terms set forth below are used in this Consent Decree, the following definitions apply:

a. "Complaint" means the Amended Complaint filed by the United States in this action;

b. "Consent Decree" means this Decree and all Attachments;

c "Day" means a calendar day unless expressly stated to be a business day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period will run until the close of business the next business day;

d. "Defendant" or "Coastal" means Coastal Lumber Company, now known as Coastal Forest Resources Company, a Virginia corporation, and Coastal Industrial Products Company d/b/a Coastal Plywood Company, a North Carolina corporation, and a wholly owned subsidiary of Coastal Forest Resources Company.

e. "Effective Date" means the date of entry of this Consent Decree by the Court;

f. "EPA" means the United States Environmental Protection Agency and any successor departments or agencies of the United States;

g. "dscf" means dry standard cubic feet;

h. "Facility" means the Coastal plywood plant located in Havana, Gadsden County, Florida;

i. "Facility-Wide" means all emissions units, excluding fugitive emissions, as defined in 40 C.F.R. § 52.21, associated with the production of plywood at the Facility;

j. "MMBTU" means million British thermal units;

k. "MSF-3/8" basis" means thousand square feet on a 3/8-inch basis;

l. "Paragraph" means a portion of this Consent Decree identified by an Arabic numeral;

m. "Parties" mean the United States and Coastal;

n. "PTE" means potential to emit;

o. "Section" means a portion of this Consent Decree identified by a Roman numeral;

p. "United States" means the United States of America, acting on behalf of EPA.

q. "VOCs" means volatile organic compounds expressed as total VOCs or as propane as stipulated in this Consent Decree.

## IV. DEFENDANT

9. Coastal Lumber Company ("Coastal"), now known as Coastal Forest Resources Company, a Virginia corporation, including its wholly owned subsidiary, Coastal Industrial Products Company, a North Carolina corporation, is the Defendant in the above referenced lawsuit.

10. At all times relevant to this action, Coastal owned and operated a plywood manufacturing plant (the "Facility") located in Havana, Gadsden County, Florida. Coastal is, therefore, an "owner or operator" within the meaning of Section 113 of the CAA, 42 U.S.C. § 7413.

11. Coastal is a "person" as defined in Section 302(e) of the CAA, 42 U.S.C. § 7602(e), and within the meaning of Section 113(d) of the CAA, 42 U.S.C. § 7413(d).

## V. CIVIL PENALTY

12. Within thirty (30) Days of the Effective Date, Coastal will pay to the United States a civil penalty in the amount of sixty thousand dollars ($60,000) in settlement of the claims alleged in Count Seven of the Amended Complaint. Payment will be made pursuant to the provisions of Paragraph 14.

13. Coastal agrees that no portion of the civil penalty paid pursuant to this Consent Decree will be used to reduce Coastal's federal or state tax obligations.

14. Payments to the United States must be by FedWire Electronic Funds Transfer

6

("EFT or wire transfer") to the United States Department of Justice Lockbox Bank referencing the civil action number of this case, and DOJ number 90-5-2-1-06361. Payment must be made in accordance with instructions provided by the United States to Coastal upon execution of the Consent Decree, which will include the name of the receiving bank, the amount to be transferred, the Department of Justice account number, the name of the payee, the United States Attorney's claim number (if applicable), and the EPA's facility number. Any EFTs received after 11:00 a.m. (Eastern Standard Time) will be credited on the next business Day. Copies of all documents accompanying the FedWire transfer and a transmittal letter referencing the Department of Justice case number, 90-5-2-1-06361, must simultaneously be mailed to the following persons:

> Wendell Reed
> U.S. EPA, Region 4
> 61 Forsyth Street, S.W.
> Atlanta, GA 30303-8960
>
> Gregory Tan, Esq.
> Office of Regional Counsel
> U.S. EPA, Region 4
> 61 Forsyth Street, S.W.
> Atlanta, GA 30303-8960
>
> Chief, Environmental Enforcement Section
> Environment and Natural Resources Division
> U.S. Department of Justice
> P.O. Box 7611
> Washington, D.C. 20044

15. If Coastal fails to timely pay the civil penalty this Consent Decree will be considered an enforceable judgment against Coastal for purposes of post judgment

7

collection under Rule 69, Federal Rules of Civil Procedure, and other applicable statutory authority without further order of this Court.

## VI. INTEREST

16. Interest on any outstanding balance of penalty will accrue thirty-one (31) Days from the Effective Date through the date of full and complete payment at the statutory rate set forth in 28 U.S.C. § 1961, as of the date of entry of this Consent Decree. In addition to any interest due pursuant to this paragraph, Coastal shall also be liable for stipulated penalties as set forth in Section XI ("Stipulated Penalties") for any penalty amounts unpaid as of 31 Days from the Effective Date.

## VII. TESTING

17. Within two calendar months of the Effective Date, Coastal shall submit to EPA for approval protocols ("VOC PTE Determination Testing Protocol") for conducting source testing ("Source Testing") to measure VOC emissions at the Facility as required by this Consent Decree. The VOC PTE Determination Testing Protocols shall be developed in accordance with Attachment A ("VOC PTE Determination Testing Protocol") of the Consent Decree.

18. Within four calendar months of receipt of written EPA approval of the VOC PTE Determination Testing Protocols, Coastal shall complete the Source Testing in accordance with the EPA approved VOC PTE Determination Testing Protocol.

19. Coastal shall submit a written notice to EPA specifying the date(s) of the Source Testing at least fifteen (15) calendar Days prior to conducting the Source Testing.

20.  In addition to the right of entry, set forth at Paragraph 61, DOJ and EPA, and their representatives and/or contractors shall be permitted to observe any Source Testing conducted pursuant to this Consent Decree.

21. Within two calendar months of completion of the Source Testing, set forth in Paragraph 18, Coastal shall submit a VOC PTE Determination And Source Test Report to EPA for its review.  The VOC PTE Determination And Source Test Report shall be submitted in accordance with Attachment B ("Contents of VOC PTE Determination And Source Test Report").

22. Coastal shall determine the Facility-Wide PTE for VOCs as it existed prior to the installation of Veneer Dryer No. 3.  The Facility-Wide VOC PTE will be determined based upon an annual production volume of 166,300 MSF-3/8" basis, which was the plant's maximum annual production capacity prior to the addition of Veneer Dryer No. 3, and will be calculated as follows:

Facility-Wide VOC PTE = Dryer VOC PTE + Boiler VOC PTE
+ Other Miscellaneous VOC PTE

a.  Dryer VOC PTE.  The veneer dryer VOC emission rate will be determined by a stack test conducted on the "hot zones" of Veneer Dryer No. 2 using the following test methods found in Appendix A of 40 CFR Part 60: Method 1 for determination of sampling locations, Method 2 for flow volume, Method 4 for moisture content, and Method 25A for VOC using propane in air as the calibration gas and following the procedures in "Standard Protocol for VOC Concentration Measurement Method for High Moisture Sources" (NCASI

9

Technical Bulletin 774, Appendix C) modified as required to accommodate the specific dilution system manufacturer, determining the test results on an "as carbon" basis, and then converting the results to an "as VOC" basis by multiplying the results "as carbon" by 1.13. The results "as VOC" will be used to determine the emission factor that will be used in the VOC PTE calculations. During these tests and consistent with sound veneer dryer operating practices, Coastal shall minimize fugitive emissions from dryer doors (through appropriate operation and maintenance procedures) and the "green end" of the dryer (through proper balancing of the "hot zone" exhausts). Total veneer dryer VOC PTE will be determined by: 1) conducting three (3) one-hour test runs on each of the three (3) "hot zone" vent stacks of Veneer Dryer No. 2, either concurrently or, if separately, under similar dryer operating conditions, with the dryer running 1/6" thick rotary peeled Southern yellow pine veneer that is "green" (i.e. not "redry"), 2) deriving an emission factor in lbs VOC per MSF-3/8" based on the average of the emission factors for the three (3) test runs on each "hot zone" vent stack, which will be based on the measured VOC emissions rates and the volumes of veneer dried (which will be calculated as follows: no. of sheets of veneer that exit the dryer during the test run x 14.222 SF-3/8" per sheet (14.222 SF-3/8" = 1/6" thickness x 4' finished panel width after sawing x 8' finished panel length after sawing / 3/8"), and 3) performing the following calculation:

Dryer VOC PTE (TPY) = Dryer VOC Emission Rate (lbs VOC/MSF-3/8")
x Annual Production Capacity (MSF-3/8") / 2000 lbs/ton

Dryer VOC PTE (TPY) = Dryer Stack Test Emission Factor (lbs VOC/MSF-3/8")
x 166,300 MSF-3/8" / 2000 lbs/ton

For example:

If the Dryer Stack Test Emission Factor is 2.910 lbs VOC/MSF-3/8", then

Dryer VOC PTE = 2.910 x 166,300 / 2000 = 242.0 TPY

b. Boiler VOC PTE. The boiler VOC emission rate will be determined by a
stack test using the following test methods found in Appendix A of 40 CFR
Part 60: Method 1 for determination of sampling locations, Method 3A for
oxygen and CO2, Method 4 for moisture content, and Method 25A for VOC
using propane in air as the calibration gas and determining and expressing
VOCs as propane for VOC PTE calculations. Boiler VOC PTE will be
determined by: 1) conducting three (3) one-hour test runs, 2) deriving an
average emission factor in lbs VOC (propane) per MMBTU heat input (HI)
from the three (3) test runs using a fuel F-factor of 9240 dscf/MMBTU, and 3)
performing the following calculation:


Boiler VOC PTE (TPY) = Boiler VOC Emission Rate (lbs VOC/MMBTU HI)
x Heat Input Rate (MMBTU HI/MSF-3/8") x Annual Production Capacity (MSF-3/8") / 2000 lbs/ton

Boiler VOC PTE (TPY) = Boiler Stack Test Emission Factor (lbs VOC/MMBTU HI) x 2.9 MMBTU HI/MSF-3/8" x 166,300 MSF-3/8" / 2000 lbs/ton

11

For example:

If the Boiler Stack Test Emission Factor is 0.014 lbs VOC/MMBTU HI, then

Boiler VOC PTE = 0.014 x 2.9 / 2000 x 166,300 = 3.4 TPY

c. Other Miscellaneous VOC PTE. Total VOC PTE from all other miscellaneous sources will be considered to be 4.6 TPY.

If, using the methodology and calculations above, Coastal's Facility-Wide PTE for VOCs prior to the addition of Veneer Dryer No. 3 was less than 250 tons per year, then EPA shall send a letter to Coastal triggering the termination provisions of this Consent Decree, set forth in Section XXI of this Decree, and Coastal shall have no further obligations under Section VIII ("Compliance Requirements") or Section IX ("Reporting Requirements") of this Consent Decree. If Coastal's Facility-Wide PTE for VOCs is 250 tons per year or greater, Coastal shall comply with Sections VIII and IX of this Consent Decree, as well as all other applicable provisions.

## VIII. COMPLIANCE REQUIREMENTS

23. Coastal must install an air pollution control system to control VOCs from the "hot zones" of veneer dryer #3 at the Facility.

24. Coastal must achieve a 90% or greater VOC destruction efficiency at the unit required to be controlled pursuant to Paragraph 23. Compliance with this Paragraph must be demonstrated in accordance with the requirements of Attachment C ("Compliance Testing Protocol And Compliance Test Report"). The compliance test will be conducted using Methods 1, 2, 4, and 25a on the dryer emissions and Methods 1, 2, 3a, 4 and 25a on

12

the boiler emissions. The calibration gas to be used for Method 25a will be propane in air.

25. Coastal must specify, in all purchase orders issued after this Consent Decree is executed and which are used to obtain, install, or operate the air pollution control system selected under this Consent Decree, that the air pollution control system provided by the manufacturer(s) must achieve a 90% or greater VOC destruction efficiency and must minimize CO and NOx emissions consistent with good engineering design of the control technology selected.

26. The 90% destruction efficiency need not be maintained during periods when the dryer is not operating or during previously scheduled startup and shutdown periods or during periods of excess emissions permitted by Florida Administrative Code, Chapter 62-210.700 (titled "Excess Emissions") or during Force Majeure events (including malfunctions which qualify as Force Majeure events). These startup and shutdown periods shall not exceed the minimum amount of time necessary for these events and, during these events, Coastal shall minimize emissions to the greatest extent practical. To the extent practical, startup and shutdown of the control system will be scheduled during times when process equipment is also shut down for maintenance.

27. Coastal's installation, startup, and compliance testing of the air pollution control system required by Paragraph 23, must be in accordance with the following schedule:

a. Within four calendar months of receipt of written notification by EPA that Coastal's Facility-Wide PTE for VOCs is 250 tons per year or greater, Coastal shall submit an administratively complete PSD application (i.e. including all of the information required on the face of the statute, regulation, or application form regarding issuance of such permits) to the Florida Department of Environmental Protection ("FDEP");

b. Coastal must complete the design, fabrication, installation, start up, shake down and debugging, and commence full-time operation of, the air pollution control system for veneer dryer #3 no later than twelve calendar months from the date of receipt of the PSD permit.

c. Coastal must submit a Compliance Testing Protocol, in accordance with the requirements in Attachment C of this Consent Decree, to EPA for review, comment and approval no later than two calendar months after the completion of the requirements of Paragraph 27b. No testing shall be conducted until EPA provides written approval of Coastal's Compliance Test Protocol.

d. Within four calendar months of receipt of written EPA approval of Coastal's Compliance Testing Protocol, Coastal must submit a Compliance Test Report, in accordance with the requirements in Attachment C, demonstrating compliance with the destruction efficiency provision of Paragraph 24 to FDEP and EPA.

28. EPA will notify Coastal in writing within three calendar months of receipt of the Compliance Test Report whether the destruction efficiency required by this Consent Decree as set out in Paragraph 24 has been met.

29.  If the destruction efficiency has not been met by the time test results demonstrating destruction efficiency must be submitted, as required by Paragraph 27d, Coastal will be subject to Stipulated Penalties pursuant to Section X ("Stipulated Penalties").

30.  Coastal must propose appropriate monitoring provisions as part of its federally enforceable permit, as well as in its Title V Air Operating Permit.  Monitoring provisions will include such monitoring as deemed appropriate by the State of Florida, subject to EPA approval, as well as associated recordkeeping to demonstrate continued compliance regarding the destruction efficiency of the air pollution control system installed pursuant to this Consent Decree.  Failure to propose compliance monitoring provisions under this Paragraph will subject Coastal to Stipulated Penalties pursuant to Section X ("Stipulated Penalties").

31.  Not later than four months following receipt of notification from EPA that the required destruction efficiency has been met, Coastal shall have applied for an amended Title V Permit and shall have applied for  any other applicable permits, which include enforceable permit conditions ensuring that Coastal shall not circumvent the intent of this Consent Decree by shifting production from Veneer Dryer #3 to Veneer Dryers #1 and #2 for the purpose of avoiding or circumventing the air pollution control system required to be installed as a result of this Consent Decree.  The Facility's Title V permit shall also require that monthly production rates from each veneer dryer be included in the Facility's Annual Operating Report that is required by the Title V permit.  Failure to obtain an

15

amended Title V Permit and any other applicable permits with the above-referenced

condition and associated reporting requirement will subject Coastal to Stipulated

Penalties pursuant to Section X ("Stipulated Penalties").

32. Where any compliance obligation required to be met under this Section

requires a federal, state, or local permit or approval within a certain period of time or by a

certain date, Coastal must submit timely and, administratively complete, applications and

take all other actions necessary to obtain all permits or approvals. Coastal may seek relief

under the provisions of Section XI ("Force Majeure") of this Consent Decree for any

delay in the performance of any obligation resulting from a failure to obtain, or a delay in

obtaining, any permit required to fulfill any obligation only if it has submitted timely and

administratively complete applications and taken all other actions reasonably necessary to

obtain all permits or approvals.

33. Any performance, maintenance or operation requirement established in a

permit obtained in connection with the requirements of this Consent Decree is

enforceable under this Consent Decree.

## IX. REPORTING REQUIREMENTS

34. Beginning with the first full calendar quarter (beginning either March, June,

September, or December) after entry of this Consent Decree, Coastal must submit a

quarterly progress report ("Progress Report") to EPA within thirty (30) Days after the end

of each calendar quarter and for four quarters after receiving the EPA notification

referenced in Paragraph 28  and at the end of every second quarter (bi-annually) thereafter

during the life of this Consent Decree. Each Report must contain the following:

a. progress reports on the implementation of the requirements of Section VIII

("Compliance Requirements") above;

b. a description of any anticipated problems with respect to meeting the

requirements of Section VIII ("Compliance Requirements") of this Consent Decree;

c. plywood production figures for each veneer dryer.

35. Each Progress Report and any other document required to be submitted

pursuant to the terms of this Consent Decree must contain a certification signed by a

responsible corporate officer of Coastal. The certification must read:

> "I, _____, certify under penalties of law that the information
> contained in or accompanying this (submission/document) is true, accurate,
> and complete. As to the identified portion(s) of this (submission/document)
> for which I cannot personally verify (its/their) truth and accuracy, I certify as
> the official with supervisory responsibility for the person(s) who, acting under my
> direct instructions, made the verification, that this is true, accurate, and complete."

36. Failure to report as required by Paragraph 34, will subject Coastal to

Stipulated Penalties as set forth in Section X ("Stipulated Penalties") of this Consent

Decree.

## X. STIPULATED PENALTIES

37. Subject to the Force Majeure and Dispute Resolution provisions of this

Consent Decree, Coastal must pay Stipulated Penalties in the amounts set forth below for

each failure to comply with the requirements of this Consent Decree. "Compliance"

includes but is not limited to, payment of the civil penalty, together with any accrued

interest, completion of all obligations under this Consent Decree, or any work plan or

17

other plan approved under this Consent Decree, in accordance with all applicable requirements of this Consent Decree within the specified time schedules established by and approved under this Consent Decree, as set forth in Section VIII ("Compliance Requirements"). "Compliance" also includes the timely reporting under Section IX ("Reporting Requirements") of this Consent Decree.

38. The following Stipulated Penalties will accrue per violation per day for categories of noncompliance identified in Paragraph 37:

Failure to Meet Material Compliance Milestones in Paragraphs 17, 18, 21, 27a, 27b, 27c, 27d, 29, and 31:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $500 | 1st through 14th day |
| $750 | 15th through 30th day |
| $1,500 | 31st day and beyond |

Failure To Comply With Reporting Requirements in Paragraph 34:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $250 | 1st through 14th day |
| $500 | 15th through 30th day |
| $1,000 | 31st day and beyond |

39. The United States will make a demand for Stipulated Penalties accruing for violations under this Consent Decree. Stipulated Penalties are payable in accordance with the following Paragraphs.

18

40. The United States may, in the unreviewable exercise of its discretion, reduce or waive Stipulated Penalties otherwise due under this Consent Decree.

41. Notwithstanding the date of any demand for Stipulated Penalties, pursuant to Paragraph 39, all Stipulated Penalties will begin to accrue on the day after the performance is due or on the day the violation occurs, whichever is applicable. Stipulated Penalties will continue to accrue until performance is satisfactorily completed or until the violation ceases. Nothing herein will prevent the simultaneous accrual of separate penalties for separate violations of this Decree.

42. Stipulated Penalties will continue to accrue as provided in accordance with Paragraph 38 during any Dispute Resolution, with interest on accrued Stipulated Penalties payable and calculated at the rate established by the Secretary of the Treasury, pursuant to 28 U.S.C. § 1961, as of the Effective Date of this Consent Decree, but need not be paid until the following:

a. If the dispute is resolved by agreement or by a decision of the United States that is not appealed to the Court, accrued Stipulated Penalties determined to be owing, together with accrued interest, must be paid to the United States within thirty (30) Days of the effective date of the agreement or the receipt of the United States' decision or order;

b. If the dispute is appealed to the Court and the United States prevails in whole or in part, Coastal must, within sixty (60) Days of receipt of the Court's decision or order, pay all accrued Stipulated Penalties determined by the Court to be owing, together with

19

accrued interest, except as provided in Subparagraph c, below;

    c. If the District Court's decision is appealed by any Party, Coastal must, within fifteen (15) Days of receipt of the final appellate court decision, pay all accrued Stipulated Penalties determined to be owing to the United States, together with accrued interest.

    43.  This paragraph was intentionally left blank.

    44.  All Stipulated Penalties must be paid within thirty (30) Days of the date payable. Stipulated Penalties owing to the United States must, as directed by the United States, be paid by Electronic Funds Transfer ("EFT"), or by certified or cashier's check in the amount due payable to the "United States Department of Justice," referencing DOJ No. 90-5-2-1-06361 and United States Attorney's Office file number 2001V00463, and delivered to the office of the United States Attorney, Northern District of Florida, 21 E. Garden St. Suite 400, Attn. AUSA Pamela Moine, Pensacola, FL 32563.

    45.  Should Coastal fail to pay Stipulated Penalties in accordance with the terms of this Consent Decree, the United States will be entitled to collect interest on all Stipulated Penalties, as provided for in 28 U.S.C. § 1961, together with the costs (including attorneys fees) incurred in any action necessary to collect any Stipulated Penalties or interest thereon.

46. Subject to the provisions of Section XV ("Effect of Settlement/Reservation of Rights"), the Stipulated Penalties provided for in this Consent Decree are in addition to any other rights, remedies, or sanctions available to the United States by reason of Coastal's failure to comply with any requirement of this Consent Decree or applicable law. The United States will elect whether it will seek Stipulated Penalties or statutory penalties for such violation.

## XI. FORCE MAJEURE

47. If any event occurs which causes or may cause a delay or impediment to performance in complying with any provision of this Consent Decree, Coastal must notify the United States in writing as soon as practicable, but in any event within 10 business Days of when Coastal first knew of an event or should have known of the event by the exercise of due diligence. In this notice, Coastal must specifically reference this Paragraph of this Consent Decree and describe the anticipated length of time the delay may persist, the cause or causes of the delay, and the measures taken or to be taken by Coastal to prevent or minimize the delay and the schedule by which those measures will be implemented. The parties must adopt all reasonable measures to avoid or minimize any delay.

48. Failure by Coastal to comply with the notice requirements of Paragraph 47 as specified above will render this Section voidable by the United States as to the specific event for which Coastal has failed to comply with the notice requirement, and, if voided, is of no effect as to the particular event involved.

21

49. The United States will notify Coastal in writing regarding Coastal's claim of a delay or impediment to performance within thirty (30) Days of receipt of the Force Majeure notice provided under Paragraph 47. If the United States agrees that the delay or impediment to performance has been or will be caused by circumstances beyond the control of Coastal, including any entity controlled by Coastal, and that Coastal could not have prevented the delay by the exercise of due diligence, the Parties will stipulate to an extension of the required deadline(s) for all requirement(s) affected by the delay actually caused by the event. Any stipulation must be filed as a modification to this Consent Decree pursuant to the modification procedures established in this Consent Decree. Coastal will not be liable for Stipulated Penalties for the period of any extension agreed to under this Section.

50. If the United States does not accept Coastal's claim of a delay or impediment to performance, Coastal must submit the matter to this Court for resolution to avoid payment of Stipulated Penalties, by filing a petition for determination with this Court. Once Coastal has submitted the matter to this Court, the United States will have twenty (20) business Days to file its response to the petition. If Coastal submits the matter to this Court for resolution and the Court determines that the delay or impediment to performance has been or will be caused by circumstances beyond the control of Coastal, including any entity controlled by Coastal, and that Coastal could not have prevented the delay by the exercise of due diligence, Coastal will be excused as to that event and delay (including Stipulated Penalties), for a period of time equivalent to the delay caused by the

22

circumstances.

51. In any proceeding under this Paragraph Coastal has the burden of proving that any delay of any requirement(s) of this Consent Decree was caused by or will be caused by circumstances beyond its control, including any entity controlled by it, and that Coastal could not have prevented the delay by the exercise of due diligence. Coastal also has the burden of proving the duration and extent of any delay attributable to the circumstances. An extension of one compliance date based on a particular event may, where appropriate, result in an extension of a subsequent compliance date or dates.

52. Unanticipated or increased costs or expenses associated with the performance of Coastal's obligations under this Consent Decree do not constitute circumstances beyond the control of Coastal, or serve as a basis for an extension of time under this Section. However, failure of a permitting authority to issue a necessary permit in a timely fashion is an event of Force Majeure where the failure of the permitting authority to act is beyond the control of Coastal and Coastal has taken all steps available to it to obtain the necessary permit including but not limited to:

(a) submitting a timely and administratively complete permit application;

(b) responding to requests for additional information by the permitting authority in a timely fashion;

(c) accepting reasonable permit terms and conditions; and

(d) pursuing appeals of any unreasonable terms and conditions imposed by the permitting authority in an expeditious fashion.

23

53. Notwithstanding any other provision of this Consent Decree, this Court must not draw any inferences nor establish any presumptions adverse to either Party as a result of Coastal delivering a notice of Force Majeure or the Parties' inability to reach agreement.

54. As part of the resolution of any matter submitted to this Court under this Section, the Parties by agreement, or this Court, by order, may, if allowed by applicable law, extend or modify the schedule for completion of work under this Consent Decree to account for the delay in the work that occurred as a result of any delay or impediment to performance agreed to by the United States or approved by this Court. Coastal will be liable for Stipulated Penalties for its failure thereafter to complete the work in accordance with the extended or modified schedule.

## XII. <u>DISPUTE RESOLUTION</u>

55. The Dispute Resolution procedure of this Section is available to resolve all disputes arising under this Consent Decree, except as otherwise provided in Section XI ("Force Majeure"), provided that the Party making application has made a good faith attempt to resolve the matter with the other Party.

56. The Dispute Resolution procedure required herein may be invoked upon the giving of written notice by one of the Parties to this Consent Decree, to another advising of a dispute pursuant to this Section. The notice must describe the nature of the dispute, and must state the noticing Party 's position with regard to the dispute. The Party receiving notice must acknowledge, in writing, receipt of the notice and the Parties must

24

expeditiously schedule a meeting to discuss the dispute informally not later than fourteen (14) Days from receipt of notice.

57. Disputes submitted to Dispute Resolution must, in the first instance, be the subject of informal negotiations between the Parties. The period of informal negotiations may not extend beyond thirty (30) Days from the date of the first meeting between representatives of the United States and Coastal, unless the Parties' representatives agree to shorten or extend this period.

58. In the event that the Parties are unable to reach agreement during the informal negotiation period, the United States must provide Coastal with a written summary of its position regarding the dispute. The position advanced by the United States will be considered binding unless, within thirty (30) calendar Days of Coastal's receipt of the written summary of the United States' position, Coastal files with this Court a petition which describes the nature of the dispute. The United States must respond to the petition within thirty (30) calendar Days of service of Coastal's petition. In any such proceeding Coastal shall bear the burden of demonstrating that the United States' position is arbitrary and capricious and Coastal's position is consistent with this Consent Decree, and with the CAA, and that they are entitled to relief under applicable law.

59. Where the nature of the dispute is such that a more timely resolution of the issue is required, the time periods set out in this Section may be shortened upon motion of one of the Parties to the dispute.

60.  As part of the resolution of any dispute submitted to Dispute Resolution, the Parties, by agreement, or this Court by order, may, if allowed by applicable law, extend or modify the schedule for completion of work under this Consent Decree to account for the delay in the work that occurred as a result of Dispute Resolution.  Coastal will be liable for Stipulated Penalties for its failure thereafter to complete the work in accordance with the extended or modified schedule.

## XIII. INFORMATION COLLECTION AND RETENTION

61.  The United States EPA and their representatives, including attorneys, contractors, and consultants, will have the right of entry to any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials to:

a. monitor the progress of activities required under this Consent Decree;

b. verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

c. obtain samples and, upon request, splits of any samples taken by Coastal or its representative, contractors, or consultants; and

d. assess Coastal's compliance with this Consent Decree.

Nothing in this Consent Decree shall limit the authority of the United States or EPA to conduct tests and inspections under Section 114 of the Act, 42 U.S.C. § 7414.

62.  Upon request, Coastal must allow split or duplicate samples to be taken by the United States or EPA or their authorized representatives.  If requested, the United

26

States or EPA will allow Coastal to take split or duplicate samples of any samples it takes.

63. Until five (5) years after the termination of this Consent Decree, Coastal must retain, and must instruct its contractors and agents to preserve, all non-identical copies of all records and documents (including documents in electronic form) now in its or its contractors' or agents' possession or control, and that relates in any manner to Coastal's performance of its obligations under this Consent Decree. This record retention requirement will apply regardless of any corporate document-retention policy to the contrary.

64. Until the conclusion of the document-retention period provided in the preceding Paragraph, Coastal must, upon the written request of the United States, deliver to EPA copies of any records or documents subject to the requirements of the preceding Paragraph. Coastal may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law. If Coastal asserts such a privilege, it must provide the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of the author of the document, record or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege claimed by Coastal. No documents, reports, or other information created or generated pursuant to the requirements of this Consent Decree may be withheld on the grounds that they are privileged.

27

65. This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or any agency thereof, including EPA, pursuant to applicable federal or state laws, regulations, or permits.

## XIV. FAILURE OF COMPLIANCE

66. The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that Coastal's compliance with any aspect of this Consent Decree will result in compliance with provisions of the CAA, 42 U.S.C. § 7401 et seq. Notwithstanding the United States' review and approval of any document(s) submitted to it by Coastal pursuant to this Consent Decree, Coastal will remain solely responsible for compliance with the terms of the CAA and this Consent Decree.

## XV. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

67. This Consent Decree resolves the civil claims of the United States for the violations of the Clean Air Act and Florida's SIP alleged in the Complaint filed in this action through the date of lodging.

68. Nothing in this Consent Decree is intended to operate in any way to resolve any civil claims other than those set forth in the Complaint or any criminal liability of Coastal.

69. Neither this Consent Decree, nor any requirement hereunder, is to be interpreted to be a permit, or a modification of an existing permit, issued pursuant to the CAA, 42 U.S.C. § 7401 et seq, nor will it in any way relieve Coastal of its obligation to

28

obtain a permit and comply with the requirements of any permit or with any other applicable Federal or State, and local statutes and regulations. Except as specifically provided for in Section XI ("Force Majeure"), the pendency or outcome of any proceeding concerning the issuance, reissue, or modification of any permit will neither affect nor postpone Coastal's duties and liabilities as set forth in this Consent Decree.

70.  Subject to Paragraph 32, neither this Consent Decree, nor any requirement hereunder, is to be interpreted to be a permit, issued pursuant to the CAA, 42 U.S.C. § 7401 et seq, nor will it in any way relieve Coastal of its obligation to obtain a permit and comply with the requirements of any permit or with any other applicable Federal or State, and local statutes and regulations.

71.  Coastal is responsible for achieving and maintaining complete compliance with all applicable federal, state and local laws, regulations, and permits. Coastal's compliance with this Consent Decree is not a defense to any action commenced pursuant to said laws, regulations, or permits.

72.  This Consent Decree does not limit or affect the rights of Coastal or of the United States against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Coastal, except as otherwise provided by law. As to others who are not parties, nothing contained in this Consent Decree constitutes an admission by Coastal of the facts and conclusions contained herein, and entry of this Consent Decree does not constitute an admission by Coastal of liability or a waiver of any right, course of action, or defense otherwise

available to it. Except as specifically provided otherwise herein, Coastal expressly reserves all rights, causes of action, and defenses available to it.

73. This Consent Decree may not be construed to create rights in, or grant any cause of action to, any third party not a party to this Consent Decree.

74. The United States reserves any and all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated herein.

## XVI. COSTS

75. The Parties will each bear their own costs of litigation of this action, including attorneys' fees, except as provided in Paragraph 45.

## XVII. NOTICES

76. Except as otherwise provided in this Consent Decree, whenever written notifications, submissions, or communications are required by this Consent Decree, they must be made in writing and addressed as follows:

To the United States:

> Gregory Tan, Esq.
> U.S. EPA, Region 4
> 61 Forsyth Street, S.W.
> Atlanta, GA 30303-8960
>
> Wendell Reed
> U.S. EPA, Region 4
> 61 Forsyth Street, S.W.
> Atlanta, GA 30303-8960

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Re: DOJ No. 90-5-2-1-06361

To Coastal:

Thomson W. Rockwood
President
Coastal Industrial Products Company
PO Box 1128
Havana, FL 32333


Paul Amundsen, Esq.
Julia Smith, Esq.
Amundsen & Smith
502 East Park Avenue
P.O. Box 1759
Tallahassee, FL 32302

77.  Notices submitted pursuant to this Section will be deemed effective upon
mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the
Parties in writing.

## XVIII. EFFECTIVE DATE

78.  The Effective Date of this Consent Decree will be the date on which this
Consent Decree is entered by the Court.

## XIX. RETENTION OF JURISDICTION

79.  The Court will retain jurisdiction of this case until termination of this Consent
Decree, for the purpose of enabling any of the Parties to apply to the Court for such

further order, direction, or relief as may be necessary or appropriate for the construction or modification of this Consent Decree, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XII ("Dispute Resolution") of this Consent Decree.

## XX. MODIFICATION

80. The terms of this Consent Decree may be modified only by a subsequent written agreement signed by all the Parties. Where the modification constitutes a material change to any term of this Consent Decree, it will be effective only upon approval by the Court. The terms and schedules contained in Attachments "A", "B", and "C" of this Consent Decree may be modified upon written agreement of the Parties without Court approval, unless any such modification effects a material change to the terms of this Consent Decree or materially affects Coastal's ability to meet the objectives of this Consent Decree.

## XXI. TERMINATION

81. Unless the Consent Decree is terminated in writing by EPA, pursuant to Paragraph 22, above, upon approval by the Court, the Consent Decree will terminate on the latest of the following: (1) one year from the date on which the United States determines that Coastal has satisfactorily completed the compliance program specified in Section VIII ("Compliance Requirements"); (2) after one year of Coastal's maintaining full compliance with the terms of this Consent Decree; or (3) after one year of Coastal's maintaining full compliance with all permit requirements under Section VIII

32

("Compliance Requirements"). In the interim, this Court will retain jurisdiction to enforce the Parties' rights and obligations under this Consent Decree. Nothing contained in this Consent Decree limits the power of the Court to issue such orders or directions as may be necessary to implement, enforce or modify the terms of this Consent Decree or to provide such further relief as the interests of justice may require.

82. Subject to the provisions of Paragraph 81, Coastal may serve upon the United States a "Motion for Termination of Consent Decree" ("Motion"), with supporting documentation demonstrating that Coastal has successfully completed all requirements of this Consent Decree and that all other requisite conditions for termination of the Consent Decree have been satisfied.

83. Following receipt by the United States of Coastal's Motion, the Parties will schedule one or more conferences (which may be by telephone) to discuss the Motion and any disagreement that the Parties may have as to whether Coastal has satisfactorily complied with the requirements of the Consent Decree and whether all other requisite conditions for termination of the Consent Decree have been satisfied. The period of consultation will continue for not less than ten (10) Days following receipt of Coastal's Motion.

84. If, following the consultation period provided for by the preceding Paragraph, the Parties cannot come to agreement as to whether Coastal has satisfactorily complied with the requirements of the Consent Decree, or whether all other requisite conditions for

termination of the Consent Decree have been satisfied, Coastal may file its Motion with the Court.

85. The United States will have the right to oppose Coastal's Motion and to seek an extension of the Consent Decree. If the United States opposes termination of the Consent Decree, Coastal will have the burden of proof by clear and convincing evidence that Coastal has satisfactorily complied with the requirements of the Consent Decree and that all other requisite conditions for termination of the Consent Decree have been satisfied.

86. If, following the consultation period provided for by Paragraph 83, the Parties agree that Coastal has satisfactorily complied with the requirements of the Consent Decree and that all other requisite conditions for termination of the Consent Decree have been satisfied, they will file with the Court an appropriate pleading so notifying the Court and requesting termination of the Consent Decree.

## XXII. PUBLIC PARTICIPATION

87. This Consent Decree will be lodged with the Court for a period of not less than thirty (30) Days for public notice and comment in accordance with 42 U.S.C. § 7413(g), and 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the public comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper or inadequate. Coastal consents to the entry of this Consent Decree without further notice unless the United States withdraws or withholds its consent pursuant to this paragraph. If

the Court does not approve the Consent Decree then neither party is bound by any provision of this Consent Decree.

## XXIII. SIGNATORIES/SERVICE

88. Each undersigned representative of Coastal, the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, and the United States Environmental Protection Agency certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents.

89. This Consent Decree may be signed in counterparts, and such counterpart signature pages will be given full force and effect.

90. Coastal agrees not to oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless the United States has notified Coastal in writing that it no longer supports entry of the Consent Decree.

## XXIV. INTEGRATION

91. This Consent Decree and the attached Attachments "A", "B" and "C" constitute the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersede all prior agreements and understandings, whether oral or written. No other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Consent Decree or the settlement it represents nor can it be used in construing the terms of this Consent Decree.

## XXV. FINAL JUDGMENT

92. Upon approval and entry of this Consent Decree by the Court, this Consent Decree will constitute a final judgment between the United States and Coastal.

## XXVI. APPENDICES

93. The following appendices are attached to and incorporated into this Consent Decree:

a. Attachment "A" is the VOC PTE Determination Testing Protocol.

b. Attachment "B" is the Contents of VOC PTE Determination And Source Test Report.

c. Attachment "C" is the Compliance Testing Protocol And Compliance Test Report.

IT IS SO ORDERED this 27th day of June, 2006.


_s/ Stephan P. Mickle_
STEPHAN P. MICKLE
United States District Judge

CONSENT DECREE RE:
U. S. v. Coastal Lumber Company,
Civil Action No. 4:01cv238 SPM
Northern District of Florida

FOR THE UNITED STATES OF AMERICA:

SUE ELLEN WOOLDRIGE
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

May 3, 2006
DATED:

ELLEN M. MAHAN
Deputy Section Chief
Environmental Enforcement Section
United States Department of Justice

MAY 5, 2006
DATED:

KARL J. FINGERHOOD
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources
   Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 514-7519
(202) 514-2583 (fax)


GREGORY ROBERT MILLER
United States Attorney
Northern District of Florida

PAMELA MOINE
Assistant United States Attorney
111 North Adams Street, Suite 400
Tallahassee, FL 32301

CONSENT DECREE RE:
U. S. v. Coastal Lumber Company,
Civil Action No. 4:01cv238 SPM
Northern District of Florida

5/3/06
DATED:

MARY KAY LYNCH
Regional Counsel
U.S. Environmental Protection Agency
Region IV
61 Forsyth Street, S.W.
Atlanta, GA 30303-8960

5/3/06
DATED:

GREGORY TAN
U.S. Environmental Protection Agency
Region IV
61 Forsyth Street, S.W.
Atlanta, GA 30303-8960

CONSENT DECREE RE:
U. S. v. Coastal Lumber Company,
Civil Action No. 4:01cv238 SPM
Northern District of Florida

FOR COASTAL LUMBER COMPANY:

COASTAL PLYWOOD COMPANY, a division of
Coastal Industrial Products Company

5/1/06
DATED:

THOMSON W. ROCKWOOD
President
Coastal Industrial Products Company

**Attachment A**

VOC PTE DETERMINATION TESTING PROTOCOL

A.   Testing Protocol Development

A separate Testing Protocol will be developed for each Source Test to be conducted as stipulated in Paragraph 22 of this Consent Decree.

Each Testing Protocol shall describe all test equipment, procedures, and quality assurance (QA) measures to be utilized in the Source Test. Each Testing Protocol must be specific for the test, facility, operating conditions, and parameters to be measured.

The following provides specific guidance pertinent to the major elements of each Testing Protocol.

1.   Title Page

The title page shall include provisions for approval signatures from all applicable state and EPA offices as well as the individual responsible for performing the Source Test and the source owner.

2.   Project Description

Provide a description of the project. The following information must be included in this section of the Testing Protocol:

    a.   Identification of the dates anticipated for start and completion of the Source Test.

    b.   Description of plant processes and control equipment, including flow diagrams.

    c.   Description of normal plant operating conditions

    The Testing Protocol shall identify the ranges of operating parameter values that are representative of normal operation, including but not limited to production rate, process data, and pollution control data as applicable. In addition, Coastal shall provide historic monthly production data for the Facility for the 48 months prior to the test month.

d.      Proposed operation during the Source Test

The Testing Protocol shall identify the target operating conditions under which the Source Test shall be conducted.  At all times during the Source Test, the source will be operated at not less than 90% of capacity unless approved by EPA.

e.      List of operation and emission parameters to be measured

The Testing Protocol shall identify the operating and emission parameters that will be monitored and recorded during the Source Test.  Operating parameters to be monitored during testing of the veneer dryer shall include, but shall not be limited to, production rates, dryer temperature, steam pressure to the dryer, and % redry rate. For other sources to be tested, Coastal will propose parameters to be measured and recorded as necessary to allow computation of applicable emission rates. The Testing Protocol shall describe how each operating and emission parameter will be monitored and recorded, including any EPA Reference Methods to be used.

3.      Project Organization and Responsibility

Include a table or chart showing the project organization and line of authority. List the key individuals, including the Quality Assurance Officer (QAO), who are responsible for ensuring the collection of valid measurement data and the routine assessment of measurement systems for precision and accuracy.

4.      QA Objectives for Measuring Data

All measurements must be made to ensure that results are representative of the normal operating conditions of the facility.  Data quality objectives will be determined and compared with the requirements for the specific project.

5.      Sampling Procedure

For each major measurement parameter, provide a description of the sampling procedures to be used.  Officially approved EPA procedures and Reference Methods will be used where applicable and as stipulated in Paragraph 22 of this Consent Decree.  The protocol should include the following:

a.      Stack diagram showing test ports, their distances from upstream and downstream disturbances, the stack diameter, and planned sampling equipment and monitoring locations.

b.      A determination of the presence and degree of cyclonic flow, if applicable.

c.      The proposed number of sampling traverse points, sampling time at each point, and total sampling volume.

d.      A detailed description of all sampling, sample recovery, and analytical procedures. The entire procedure in the case of nonstandard procedures or modifications should be described with justifications and necessary data for backup. Options offered by an EPA Reference Method should be selected and justified.

e.      Any special conditions for the preparation of the sampling equipment and containers to avoid sample contamination.

f.      Samples of forms to be used to record sample history, sampling conditions, and plant operating conditions.

g.      Methodology for measurement of plant operating conditions, including production rate, process data and pollution control data, and data recording time intervals.

h.      If more than one sampling train is to be used, detailed description of the relevant sequencing and logistics.

i.      If Continuous Emission Monitors (CEMs) are to be used, detailed description of the operating and data logging procedures.

6.      <u>Sample Custody</u>

At a minimum, if applicable, the following sample custody procedures will be addressed in the Testing Protocol:

a.      Documentation of procedures for preparation of reagents or supplies which become an integral part of the sample (e.g., filters and absorbing reagents).

b.      Procedures and forms for recording the exact location and specific considerations associated with sample acquisitions.

c.      Prepared sample labels containing all information necessary for effective sample tracking.

7. <u>Calibration Procedures and Frequency</u>

Include calibration procedures and information for each major measurement device, including coefficients, by reference to a standard method or by providing written description. Provide the frequency planned for recalibration during the test and a list of all calibration standards including their source and traceability.

8. <u>Documentation</u>

Include sample copies of all data log sheets and examples of any calculations that will be performed on the raw data. <u>Note</u>: copies of all raw data sheets, including manually and automatically recorded data (strip charts and data logger or computer printouts) will be submitted with the Source Test Report and copies must be available at the end of each day's testing.

**Attachment B**

<u>CONTENTS OF VOC PTE DETERMINATION AND SOURCE TEST REPORT</u>

The VOC PTE Calculation and Source Test Report shall be organized in the manner, and contain the information, set forth below:

<u>Conclusion</u>

This section shall include the summary calculations stipulated in Paragraph 22 of this Consent Decree as well as Coastal's conclusion regarding the implication of the summary calculations with respect to resolution of this Consent Decree.

<u>Source Test Summaries</u>

A summary of each Source Test conducted shall be included and each shall be organized in the manner, and contain the information, set forth below:

<u>1. Title of Source Test</u>

<u>2. Introduction</u>

Background information pertinent to the Source Test should be presented in this section. This information shall include, but shall not be limited to, the following:

　　　　a.　　Description of the model name, size, rated capacity, and number of the unit tested with the name and address of the manufacturer of the unit tested;

　　　　b.　　Name and address of the testing organization;

　　　　c.　　Test dates, names of persons present during test, and location of the Source Test;

　　　　d.　　Schematic drawings of the unit tested, noting emission points, sampling sites, and stack cross sections, with sampling points labeled and dimensions indicated; and

　　　　e.　　A discussion of the operating principles of the type of unit tested, including maximum production rate of the unit and operating parameters of any air pollution control device on the unit.

## 3. Results

A summary of the results of the Source Test pertinent to the determination of the VOC PTE of the unit with respect to this Consent Decree should be presented in this section. This information shall include, but not be limited to, the following:

       a.      A summary of emission rates found;

       b.      Isokinetic sampling rates achieved, where applicable; and

       c.      The operating level of the unit and the relevant process production, raw material and control device parameters levels during the Source Test, including but not limited to, for the veneer dryer source test, the veneer dryer production rate by wood species, zone temperature, line speed, % redry rate, and moisture content of the dried veneer.

## 4. Procedures

A description of the procedures used in the operation of the sampling train and unit during the Source Test should be presented in this section. The information shall include, but shall not be limited to, the following:

       a.      A schematic drawing of the sampling devices used, with each component designated and explained in a legend; and

       b.      A description of the method used to operate the sampling train and the procedure used to recover the samples collected.

## 5. Analytical Technique

A description of all analytical techniques used to determine the emissions from the source should be presented in this section.

## 6. Data and Calculations

All actual data collected and the actual calculations should be presented in this section. This information shall include, but not be limited to the following:

       a.      All field data collected, including legible copies of field data sheets (raw data) and any transcribed or computer data sheets;

       b.      Laboratory data, including blanks, tare weights, calibration data, quality assurance samples, and results of the analyses;

c. All calculations used in the determinations of emission rates, process rates, or other factors relevant to the test results, compliance, etc.;

d. Explanations and calculations substantiating the determination of the number and the location of traverse points used during the Source Test

## 7. Quality Control

This section shall include all records of quality control measures taken during the performance of the Source Test.

## 8. Chain of Custody

If applicable, a listing of the chain of custody of the emission test samples should be presented in this section.

## 9. Calibration Work Sheets

This section shall include calibration work sheets for sampling equipment.

## 10. Production Records

Reports, log sheets, strip chart recordings of all relevant operating parameters must be included.

All data sheets, strip charts, and print-outs must be sufficiently annotated or explained to make their intention and information clear and understandable.

## Analysis by EPA

In analyzing the information provided by Coastal pursuant to this Attachment, EPA reserves the right to reject any conclusion or test result that it determines is invalid due to failure by Coastal or its contractor to adhere to the Testing Protocol approved by EPA, or due to any material lapses in quality control in testing or analysis, failure to properly establish chain-of-custody for any samples collected, or failure to adhere to the VOC PTE determination methodology or calculations stipulated in Paragraph 22 of this Consent Decree.

**Attachment C**

<u>COMPLIANCE TESTING PROTOCOL AND COMPLIANCE TEST REPORT</u>

Coastal agrees to undertake compliance determinations according to the terms identified in this testing protocol in the event that an air pollution control technology system is required to be installed at its Facility by this Consent Decree.

In addition, Coastal must demonstrate a 90% or greater reduction of VOC emissions across the air pollution control technology system installed on plywood veneer dryer #3.

The following requirements are applicable:

1. The test will consist of three (3) one hour test runs.

2. Testing must be performed to determine the mass VOC emissions, as propane, leaving veneer dryer #3 (lbs/hr VOC in) and exiting (lbs/hr VOC out) the control devices. The emissions leaving veneer dryer #3 includes the sum of all emissions of the "hot zones" of dryer #3. The destruction efficiency (D.E.) for each test run will be calculated using the following equation:

% D.E. = [(lbs/hr VOC in - lbs/hr VOC out) / (lbs/hr VOC in)] x 100

The overall destruction efficiency will be calculated by averaging the % D.E.s of the three (3) test runs.

If the air pollution control system includes incineration in wood-waste-fired boilers, appropriate adjustments will be made to account for baseline boiler VOC emissions that are not related to veneer dryer #3. Specifically, baseline boiler VOC emissions will be measured when no dryer #3 VOC is present (but operating at the same rate) and will be deducted from total boiler VOC emissions with dryer #3 VOC to determine "lbs/hr VOC out" in the above formula. The boiler VOC testing required pursuant to Paragraph 22 of this Consent Decree may be used for purposes of determining baseline boiler VOC emissions if appropriate.

If the overall destruction efficiency is calculated to be equal to or greater than 90%, Coastal has completed its obligations of demonstrating the destruction efficiency of the control device under this Consent Decree.

3. The test methods to be used will be as specified in Paragraph 24 of this Consent Decree.

4.  The calibration gas to be used for the test and the basis on which VOCs will be measured and calculated will be as specified in Paragraph 24 of this Consent Decree.

5. During each test run, the process being controlled must be operated at not less than 90% of its maximum capacity unless approved by EPA.

A. Compliance Test Protocol

Coastal is required to include the following information in the Compliance Test Protocol that is required by Paragraph 27 of this Consent Decree:

a. A brief description of the manufacturing process at the facility and the air pollution control equipment associated with the process including the type of control device, the anticipated operating parameters of the process unit and control device during testing, permit limits, and the maximum design capacity, if known.

b. A description of the emissions sampling equipment including a schematic diagram of the sampling train.

c. A sketch with the dimensions indicating the flow of exhaust gases from the process, through the control equipment associated ductwork to the stack, including, according to Method 1 (40 C.F.R. Part 60), the following:

> (1)    An elevation view of the dimensions of the stack configurations indicating the location of the sampling ports and distances to the nearest upstream and downstream flow interference, and

> (2)    A cross-sectional sketch of the stack at the sampling locations with dimensions indicating the location of the sampling traverse points.

d. Estimated gas flow conditions at the sampling location, including temperature, moisture content, velocity, and static pressure.

e. A description of the process and list of control equipment operating data to be collected during the sampling period. Also include the proposed wood species to be processed during the tests.

f. Copies of the field data sheet forms to be used during the tests.

g. Identification of the testing firm, and contact person, which will be performing the testing.

h. A description of the procedures for assuring the accuracy of the data collected, including chain of custody and quality control procedures.

B. Compliance Test Report

Coastal is required to include the following information in the Compliance Test Report that is required by Paragraph 27 of this Consent Decree:

a. Introduction and Summary

    (1) Identification, location, and dates of tests.

    (2) Summary of emission data.

    (3) Name and affiliation of all persons participating in the tests.

b. Plywood Veneer Dryer #3 operating conditions during the testing

    (1) Plywood Veneer Dryer #3 data reported will include:

        (i)     Hourly production (in ft²/hr on 3/8" basis) meeting the facility's dryness specifications through the dryer during the test.

        (ii)    Species processed, represented as a percent of total hourly production.

        (iii)   Estimated average inlet and outlet dryer temperatures.

        (iv)   Percent redry, represented as a percent of total hourly production.

        (v)     Percent moisture in the dried veneer.

        (vi)   Estimated average dryer temperature of the heated zones for the dryer during the test.

c. EPA approved control device operating parameters

    (1) Average chamber temperature during the test

    (2) Airflow rate in the stack.

(3) Temperature of the stack gases exiting the unit.

d. Sampling and Analytical procedures

    (1)    Description of the sampling train and field procedures.

    (2)    Description of analytical procedures, including calibration and recovery as applicable.

    (3)    Sketch indicating sampling port locations relative to process and control equipment, upstream and downstream disturbances.

    (4)    Cross-section sketch of the stack, indicating traverse point locations.

    (5)    Copies of all field data collected during the test (including filter temperatures of testing device), including sampling data sheets and the process information indicated in Section 2.

    (6)    Copies of all analytical laboratory data as applicable.

    (7)    Sampling equipment and laboratory calibration data.

    (8)    Copies of all chain of custody information as applicable.

e. Calculation and data reduction methods

    (1)    Description of computational methods, including equation format used to obtain emissions results from field data.

    (2)    Example calculations from at least one run of each type of test performed.

f. Test results and discussion

    (1)    Detailed tabulation of results including process operating conditions and gas flow conditions.

    (2)    Discussion of any divergences from normal sampling procedure or operating conditions which could have affected the results.

    (3)    The results of the Destruction Efficiency calculations.